## POST *v.* COUNTY OF PULASKI.

*(Circuit Court, S. D. Illinois.  June Term, 1891.)*

1. RAILROAD COMPANIES—MUNICIPAL AID—NOTICE OF ELECTION.
    Act Ill. March 6, 1867, granting a charter to the Cairo & Vincennes Railroad Company, provides that counties through which the railroad shall pass may take stock and issue bonds in payment to the company, provided a majority of the legal voters of the county shall vote for the same, at an election to be held under the order and direction of the county court.  Act Ill. Nov. 6, 1849, provides that such elections shall be called on 30 days' notice.  *Held,* that the act granting the charter did not authorize an election except on the notice required by statute, and where bonds have been issued, and the authority of the county to issue them is questioned, it devolves on the holder of the bonds to prove that notice of the election under which they were issued was duly given.

2. SAME—IRREGULARITIES—CURATIVE ACT.
    Act Ill. March 6, 1867, § 3, concerning the issuance of bonds by counties to aid in the construction of the Cairo & Vincennes Railroad, provides that all orders for and notices of elections in respect to subscription of stock to said company, in any counties, are hereby declared valid.  Const. Ill. 1870, provides that no county shall become a subscriber to the capital stock of a railroad corporation, except where the subscription was authorized under existing laws by a vote of the people, prior to the adoption of the constitution.  *Held,* that irregularities of elections held to vote on the question of taking stock, after the adoption of the constitution, were not cured by the act of 1867.

3. SAME—RECITALS IN BONDS—ESTOPPEL.
    A recital in a bond, issued by a county to aid in the construction of a railroad, that the election ordering such bond was held pursuant to law, does not estop the voters of such county from denying the authority of the county commissioners to issue the bonds.

At Law.

*Connolly & Mather,* for plaintiff.

*Brown, Wheeler & Brown* and *L. M. Bradley,* for defendant.

ALLEN, J.  This action was prosecuted on 196 interest coupons attached to 36 railroad aid bonds issued by Pulaski county on the 17th day of October, 1872, in part payment of a $100,000 subscription to the capital stock of the Cairo & Vincennes Railroad Company.  The subscription was made under the tenth section of the Cairo & Vincennes Railroad charter, to be found in volume 2 of the Private Laws of the State of Illinois, passed in 1867, and is as follows:

"Sec. 10.  The several towns, cities, or counties through or near which said railroad shall pass may subscribe for and take stock in this company, and may issue bonds in payment of such stock of five hundred dollars each, bearing interest at the rate of eight (8) per cent. per annum or less, payable half-yearly, in the city of New York, on the first day of January and July of each year, and bonds to run not longer than twenty-five years.  And a tax of not more than one dollar on each hundred dollars' worth of taxable property may be levied and collected in such town, city, or county, per annum, to pay the installment on such stock, or to pay the interest and principal of bonds issued in payment for such stock: provided, that no such subscription shall be made, no such bonds shall be issued, and no such tax shall be levied unless a majority of the legal voters of said town, city, or county shall vote for the same at an election to be held under order of the corporate authorities in cases of towns and cities, and of the county court in cases of counties: provided, further, that a majority of the legal voters at any such election shall be held as a majority of the legal voters of any such town, city, or county; and the ques-

tions of making a subscription, issuing bonds, and levying taxes may be submitted as one question, or as *separate* questions, at such election; and either or all of said questions may be submitted to an election at any time, in the discretion of the authorities authorized to call such election."

One of the principal questions arising in the case is as to whether it devolved upon the plaintiff to prove on the trial that notice of the election under which the subscription was made had been duly given. No sufficient evidence to establish that fact was offered, and the plaintiff's contention is—*First*, that, under the tenth section of the charter above quoted, authority is expressly given to the county to subscribe stock, and that a notice of the election was not necessary; *second*, that, if such notice was necessary, the legal presumption is that it was given; and, *third*, that the county authorities, having recited on the face of the bonds that the election was held pursuant to law, are now estopped from denying that there was the proper legal notice.

The first is deemed insufficient. The right of the county to subscribe stock, it is admitted, rests upon the power, conferred by the tenth section of the charter. This section contains the proviso "that no such subscription shall be made, no such bonds shall be issued, and no such tax levied unless a majority of the legal voters of said town, city, or county shall vote for the same at an election under the order of the corporate authorities in cases of towns and cities, and of the county court in cases of counties." The right of subscription is made to depend upon the express consent of a majority of the legal voters of a county. Every principle of safety and justice necessarily requires a majority of the legal voters to consent to the imposition of so great a burden as the creation of a debt to the amount of $100,000, bearing interest at the rate of 8 per cent. per annum, in aid of a *quasi* private enterprise. Such municipalities as counties were not created to engage in commerce generally, or to assist in building railroads, but for governmental purposes only. The right to subscribe then depended upon the clearly expressed will of the legal voters at an election held under the order of the county court. But can there be a fair and valid election without notice? The legal voter is entitled to know when, where, and upon what matter he is called upon to vote. This would seem to be fundamental. All legal elections must be held under some law. If there was nothing said in the charter about notice, the general railroad aid law of 1849 was in full force, requiring 30 days' notice of such an election, and it, at least, should have been observed. *Harding* v. *Railroad Co.*, 65 Ill. 90.

Nor can the second be accepted. The general proposition that public officers are always presumed to do their duty is not denied, but such presumption cannot waive the indispensably necessary proof in this case. The adoption of the constitution of 1870 marked a new era in the policy of Illinois with reference to municipal subscription and indebtedness, providing, as it did, that—

"No county, city, town, or township, or other municipality, shall ever become subscriber to the capital stock of any railroad or private corporation, or make donation to or loan its credit in aid of such corporation: provided, how-

.ever, that the adoption of this article shall not be construed as affecting the right of any such municipality to make such subscriptions where the same have been authorized, under existing laws, by a vote of the people of such municipalities prior to such adoption."

Since that time all bonds issued by this class of corporations are *prima facie* invalid, and the burden is clearly thrown upon those affirming their validity, of proving they were authorized by a vote of the people of the municipality under then existing laws. The power to make subscriptions was expressly denied in any and every case, but such as might be saved by the proviso; and the one claiming a right saved by an exception or proviso in a statute must show affirmatively that the right so claimed is clearly within the proviso or exception, otherwise the presumption is that it is embraced in the enacting clause. The subscription in this case was not made till the 4th day of March, 1872. In *People v. Jackson Co.*, 92 Ill. 441, it was said:

"We are unable to find any evidence that notices were posted in a portion of the precincts; and the evidence as to the election subsequently held in 1869 is equally loose, indefinite, and unsatisfactory in its character. The burden was upon the relator to prove that the notices were given. It being a special election, and the exercise of a special power, a compliance with the authority *must be shown and cannot be inferred.*"

Inferences and presumptions of the character relied on are not sufficient to uphold the subscription.

The third reason, estoppel by recitals in the bonds, strongly urged and relied on by plaintiff's counsel, is equally unsatisfactory. It may be conceded, as a doctrine now well established, that municipal officers are bound by recitals in their bonds as to all matters affecting the regularity of proceedings which they have passed upon, but it would certainly be a dangerous doctrine to maintain that they are estopped from denying their legal power or authority to make the same. These officials are the financial agents of the people, clothed with a limited power of executing or performing some trust or duty. If no power has been granted or voted them in any contingency to do acts or execute instruments creating or evidencing grievous indebtedness upon the city, town, or county, will their recitals on the face of the instrument, that they are executed in pursuance of law or sufficient authority, make binding obligations of such instruments as without the recitals would be utterly void? This cannot be the law. Such a rule affords no safety or security to the taxpayer. The plaintiff in this case may be regarded as a *bona fide* or innocent holder of the bonds or coupons, and may possibly suffer to the extent of the money he paid for the same. And yet it is far better he should do so than to recognize the doctrine that municipal officers without authority may, by placing on the face of their bonds untrue statements, thereby bind the people to pay them. The plaintiff should not have relied on the recitals in the instruments, but it was his duty to examine into the question of power on the part of the Pulaski county commissioners to make the bonds. He was bound .to take notice of the want of power. This is an old, a safe, and

a familiar doctrine, repeatedly recognized by the supreme court of the United States and the supreme court of the state of Illinois. The latter tribunal has often held to the effect just indicated. Chief Justice WAITE, delivering the opinion of the court in the case of *Douglass* v. *County of Pike*, 101 U. S. 677, said: "After a statute has been settled by judicial construction, the construction becomes, so far as contract rights under it are concerned, as much a part of the statute as the statute itself." And in *German Sav. Bank* v. *Franklin Co.*, 128 U. S. 526, 9 Sup. Ct. Rep. 159, it is laid down "that this court must recognize this decision of the supreme court of Illinois as an authoritative construction of the statute made before the bonds were issued, and to be followed by this court." Before the bonds were issued, from which the coupons sued on were taken, the supreme court of Illinois in *Harding* v. *Railroad Co.*, *supra*, had held that "if any general or special statute, which controlled the election, required the publication or posting of a notice for thirty days prior to the holding of an election, and this was not done, then the election was invalid, and the expression of the will of the voters thus obtained conferred no power upon the board of supervisors either to make the subscription or to issue the bonds;" and of this holding plaintiff was bound to take notice when he purchased his bonds.

And, lastly, plaintiff contends that his right to recover is confirmed by the third section of "An act to amend an act entitled 'An act to incorporate the Cairo and Vincennes Railroad Company,' approved March 6, 1867, and for other purposes," which provides, among other things, that "all orders for and notices of elections, and elections, and returns of such elections, in respect of such subscriptions of stock to said company, in any such towns, cities, or counties, are hereby declared to be valid and binding upon such towns, cities, or counties." 3 Priv. Laws Ill. 1869, p. 259. A curative act similar in many of its provisions, and really intended to effect the same purposes, was passed upon in *Jonesboro City* v. *Railroad Co.*, 110 U. S. 192, 4 Sup. Ct. Rep. 67; and it was there held that the general assembly of Illinois had power to pass such a law; and that the phrase "under existing laws," in the section of the Illinois constitution referred to, relates to the time of the adoption of the constitution, rather than to the time when the vote of the people was in fact taken. The supreme court of Illinois at the June term, 1879, held in *Gaddis* v. *Richland Co.*, 92 Ill. 119, that such curative acts as the one in question were vicious and unsupported by constitutional authority, saying that—

"When it is remembered that these elections were held without power (no sufficient notice having been given) in the body ordering them, as they conferred no more power than if they had never been held, it is apparent that this subscription is as clearly unauthorized as if the legislature had recited that ten or any other number of citizens of the county had come together and voted to subscribe two hundred thousand dollars to the stock of the road, and it a legal election, and commanded the board to subscribe for the stock and issue the bonds. It was, in legal effect, precisely as though no effort had ever been made to hold an election, and it gave no validity to the bonds."

The Illinois supreme court has also frequently held that the saving clause in the proviso of separate section 2 of the constitution of 1870, in regard to municipal subscriptions, to the effect that the section shall not affect the right to make such subscriptions, when the same have been authorized "under existing laws," prior to the adoption of the constitution, refers to and embraces subscriptions that had been authorized by a vote of the people, under laws existing at the *time* the vote was taken. *People* v. *Jackson Co., supra; Williams* v. *People*, 132 Ill. 574, 24 N. E. Rep. 647. No other construction by the courts of Illinois, it is believed, has ever been given to this section of their constitution; and it is evident that the case of *People* v. *Jackson Co.*, 92 Ill. 441, was not cited or considered by the supreme court of the United States when the construction of the Illinois constitution was given in *Jonesboro City* v. *Railroad Co., supra.* The desire of the federal courts to act in harmony with the state courts is strong, and will always prevent the former from conflicting with the latter in construction of their own constitutions and statutes, in all cases where the state courts have first given such a construction. The courts of Illinois having, with reference to the constitutional article and the legislative curative act, held adversely to plaintiff's right to recover, their decisions will be followed, and judgment rendered for defendant.