*Harlan & Craddock* for appellant: *Morehead & Reed* for appellee.

FERRY CASE.

## Lexington and Harrodsburg Turnpike Road Company *vs* McMurtry.

*Case* 40.

APPEAL FROM THE JESSAMINE COUNTY COURT.

*County Courts. Justices, de facto.*

*Oct.* 16.

JUDGE MARSHALL delivered the opinion of the Court.

The case stated.

AT the August term, 1843, of the Jessamine County Court, each of these parties having applied to that Court for a grant of the ferry privilege across the Kentucky river, where the Lexington and Harrodsburg Turnpike Road strikes the river, an order or orders were made refusing the privilege to McMurtry and granting it to the Turnpike Company. And at the August term, 1844, on motion of McMurtry, of which the company was duly notified, these orders were set aside without any reason assigned therefor in the order itself, but upon the ground, as may be collected from the notice and the evidence, as contained in a bill of exceptions, that in August, 1844, the Court was of opinion that one of the persons who sat upon the bench as a member of the Court which had made the orders of 1843, had forfeited or vacated his office by removal from the county of Jessamine, and as may be supposed from the ground stated in the notice, though the fact is not made to appear in this record, on the ground that there was not a competent Court without the individual referred to, or that his vote was necessary to constitute the majority which made the orders. If it were conceded that the County Court might, upon their judgment as to the composition of the Court at a previous term, set aside and annul an order appearing upon their records as the act of a competent Court, still the annulling order in this case, would be revisable, because it is not shown

in the present record, either that there was not a compe-
tent Court without the presence of the individual whose
competency is now objected to, or that his vote was essen-
tial to the passage of the order.   But as this defect might
possibly have been supplied by the order book showing
who sat on the bench at the August term, 1843, when the
orders in question were made, we need not place our
judgment of reversal exclusively on that ground.   Waiv-
ing this objection, we are still of opinion that the annul-
ling order of August, 1844, is erroneous and unauthor-
ized.

In the first place, the orders refusing the ferry to one
and granting it to another applicant, were judicial acts
determining the rights of individuals, and final in their
character; and standing as they do, regularly recorded as
the acts of the County Court, we do not perceive upon
what principle they can be excluded from the operation
of the rule which declares every final judgment or order
to be beyond the power of the Court at a subsequent
term, except for correction of clerical mistakes by the re-
cord itself.   This rule has been found essential for main-
taining the verity of records, and the authority of judi-
cial proceedings, and both of these would be greatly
weakened, and the rights dependent upon them brought
into jeopardy, if upon extraneous facts which might be
supposed to affect the competency of the tribunal, its
final orders or judgments might, at a subsequent term, be
set aside by order of the same Court.   If on the ground
of such extraneous facts the judgment or order be in fact
void, it might undoubtedly be so considered in the same
or other Courts, whenever its validity should come in
question.   And there are various modes by which its effi-
cacy might be denied and brought to a judicial test.   But
in our opinion the principles which have been stated pro-
hibit the direct action of the same Court upon its own
orders or judgments, however invalid, by setting them
aside at a subsequent term, upon extraneous facts, bring-
ing in question the composition of the Court at the time
such order or judgment was pronounced.

If, however, we were mistaken in this opinion, we are
satisfied upon the facts appearing in evidence, that there

LEXINGTON AND
HARRODSBURG
TURNPIKE Co.
*vs*
McMURTRY.

A County Court
has no power at
one term to set
aside and vacate
an order of a pre-
vious      term,
which is judicial
and  determines
rightly  between
parties—it  may
correct  clerical
misprisions.

is no sufficient ground for determining against the competency of the Court which made the orders in question, at the August term, 1843, for want of right in the individual whose official character is now questioned, to sit as a member of the Court at that term, nor for disputing the validity of the acts of the Court in which he participated, though there may have been no Court without him for want of a sufficient number of Justices, or although his vote may have determined the majority.

It appears, that in September, 1842, Joseph H. Chrisman, then a Justice of the Peace of Jessamine county, who may be assumed to have been commissioned, qualified and acting as such, and then residing in that county, married a widow, who was residing on her own farm in the adjoining county of Fayette; that in November following, he removed to her farm with his family and part of his household furniture and stock, where he has remained ever since; that he rented out the arable part of his farm in Jessamine, together with his slaves and work horses, for the year 1843, but reserving the house and the pasture land, on which his stock remained during the year, and that he was frequently in Jessamine attending to his business. He himself states that he did not go to Fayette with the intention of taking up his residence there, but intended returning to his farm in Jessamine as soon as his wife could conveniently leave hers in Fayette; that he held a military office in Jessamine, as well as that of Justice of the Peace, and continued to hold and exercise those offices, and always considered himself a citizen of Jessamine, and never intended to take his residence in Fayette, until in the month of November, 1843, when his property, including his farm in Jessamine, was sold under a decree foreclosing a mortgage, since which time he has determined to remain in Fayette; that he voted in Jessamine in August, 1843, and had not claimed nor exercised the right of suffrage in Fayette until 1844; and that as soon as he determined to take his residence in Fayette, (which was in November, 1843,) he resigned the two offices he had held in Jessamine. And it does not appear that up to August, 1843, or up to November, 1843, the County Court had taken any steps to fill his office, as

having been vacated by removal, or that his official acts or character, were questioned either by that Court or by any individual; but on the contrary, he sat on the bench as a member or the Court in August, 1843, and the parties to the present controversy then submitted their rights to a Court consisting of himself and others, without objection to the competency of the Court by themselves or others.

In the case of *Lyon* vs *The Commonwealth*, (3 *Bibb*, 432,) this Court decided that the temporary removal or departure of a Justice from his county, under a contract to do business in another county, as vendor of goods in a store, for four months, with an intent then to return to his place of residence, was not such a removal as forfeited his office—and said that a removal to have that effect, must be absolute, with an intent to change the residence. If then the validity of Chrisman's acts as a Justice, and of the acts of the County Court of which he sat as a member, are to be tested by the question whether he had removed from the county with an intent to change his residence, we think it clear upon an analysis of the facts, that it could not have been determined in August, 1843, that he had removed with that intent. Up to that time he was claiming citizenship or residence in Jessamine, avowing his intention to return, and exercising without question, his local rights and offices in that county. If in November following he had returned to his farm instead of then determining to remain in Fayette, no steps having been taken to declare a forfeiture of the office or to fill it, there could not have been a doubt as to his being still a Justice of the Peace of Jessamine county. The subsequent fact of his remaining in Fayette and not returning to Jessamine, cannot of itself, affect either his pre-existing rights or the validity of his intermediate acts, but can only operate as evidence of the intention with which he left the county of Jessamine. And as his continued residence in Fayette is shown to have been the consequence of a change of intention sufficiently accounted for, its tendency by reflection, to prove an original intention to reside there, is sufficiently rebutted. We cannot, therefore, say at this time, any more than it could

LEXINGTON AND HARRODSBURG TURNPIKE Co.
*vs*
McMURTRY.

The removal of a Justice of the Peace from the county for which he is appointed, to be a vacation of his office, must be with the absolute intent to change his residence.

Llxington and
Harrodsburg
Turnpike Co.
vs
McMurtry.

have been said in August, 1843, that he had then remov-
ed to Fayette, with the intention of changing his resi-
dence, or that he then entertained that intention. It is
admitted that there might be facts and acts of the party
which would more than countervail any declaration of in-
tention. But here the facts are of a different character,
as is evident from the fact that notwithstanding his having
left his farm in Jessamine, he reserved his house, left his
slaves, &c. there, and was frequently in that county exer-
cising his local offices there, and recognized as an officer
of that county, not only by individuals, but even by the
Court whose duty it was to take steps for filling his office
of Justice of the Peace, if it had become vacant by his
removal.

But again, supposing it to have been now shown, be-
yond dispute, that he had intended, from the first, to
change his residence, and that he held on to his offices in
Jessamine under the pretext of a contrary intention, until
all ground for such a pretext was removed, still he was,
under the avowal of a contrary intention, acting and re-
cognized as a Justice of the Peace in the county of Jessa-
mine. There is no statute or judicial decision determin-
ing what length of absence from the county shall forfeit
the office, there was no action of the County Court based
upon its supposed forfeiture or vacancy; and we are of
opinion that whatever might be said of the efficacy of his
claim as an officer to protect himself in acts done under
color of office, he must be regarded as having been, in
August, 1843, a Justice of the Peace *de facto*, if not *de
jure*, and on that ground his acts, whether as a mere Jus-
tice of the Peace or as a sitting member of the County
Court, should be deemed valid as to the public and third
persons: *Rodman* vs *Harcourt. &c.* (4 *B. Monroe*, 224.)
We are of opinion, therefore, that the orders made be-
tween these parties at the August term, 1843, of the Jes-
samine County Court, are not, for any thing now appear-
ing, void, but that they are valid and binding between
the parties; and that on this ground, if there were no
other, the order of the August term, 1844, setting said
previous orders aside is itself erroneous and unauthorized.

Though a Jus-
tice of the Peace
may have left his
county with the
intention to
change his resi-
dence, yet exer-
cising his office
under a pretence
of a contrary
intention, he
is a Justice
*de facto*, and his
acts as such are
binding on third
persons until
some action be
taken for filling
his vacancy.

Wherefore, the said order of the August term, 1844, is reversed, and the cause is remanded with directions to overrule the motion of McMurtry.

*Robertson and Hewitt* for appellants: *Robinson & Johnson* for appellee.